1996 SD 64

**Richard Norman ST. CLOUD,
Applicant and Appellant,**

v.

**Joe CLASS, Warden, South Dakota
State Penitentiary, Appellee.**

No. 19288.

Supreme Court of South Dakota.

Argued March 13, 1996.

Decided May 29, 1996.

Timothy M. Gebhart, Davenport, Evans, Hurwitz and Smith, Sioux Falls, for Applicant and Appellant.

Mark Barnett, Attorney General, John P. Guhin, Assistant Attorney General, Pierre, for Appellee.

SABERS, Justice.

[¶ 1] St. Cloud appeals the denial of his application for writ of habeas corpus. He claims the jury panel did not represent a fair cross section of the community and that his counsel was ineffective. We affirm.

## FACTS

[¶ 2] St. Cloud is a Native American whose blood quantum is 15/32 Yankton Sioux and 7/16 Ponca. He is 29/32 Native American.[1] As a child, he was enrolled in the Ponca Tribe of Nebraska. The United States Congress terminated the Ponca Tribe of Nebraska in 1962, but restored federal recognition of the tribe in 1990. St. Cloud was married to an enrolled member of the Lower Brule Sioux Tribe and lived on the Lower Brule Reservation from 1973 to 1986.

[¶ 3] In April 1986, St. Cloud was charged with the kidnapping and rape of a non-Indian woman on the Lower Brule Reservation. St. Cloud pleaded guilty in federal district court to involuntary sodomy. After he was sentenced, St. Cloud filed a motion for dismissal in federal district court, which was granted. The federal district court found that it lacked jurisdiction to convict St. Cloud because he was not an "Indian" for the purpose of federal criminal jurisdiction due to the termination of his tribe. *St. Cloud v. United States*, 702

F.Supp. 1456, 1466 (D.S.D.1988) *(St. Cloud I)*.

[¶ 4] St. Cloud was tried in state court in Lyman County, where the Lower Brule Sioux Reservation is located, on charges of first-degree rape and kidnapping. In December 1989, a jury found him guilty on both counts. He was sentenced to the South Dakota State Penitentiary for twenty-five years for rape and sixty years for kidnapping, with the sentences to run concurrently. His convictions were affirmed on direct appeal to the South Dakota Supreme Court. *State v. St. Cloud*, 465 N.W.2d 177, 182 (S.D.1991) *(St. Cloud II)*.

[¶ 5] St. Cloud applied for a writ of habeas corpus. One of the issues he raised was a violation of his constitutional right to a jury comprised of a fair cross section of the community, because Native Americans were underrepresented on the jury panel. The habeas court denied his application, finding St. Cloud had no standing to challenge the underrepresentation because he was "not an Indian." St. Cloud appealed to this court. We noted the federal district court's decision that he was not an Indian for the purpose of federal prosecution, but held that he was racially an Indian. We stated that St. Cloud did not need to be a member of the group excluded from the jury pool in order to challenge underrepresentation. We remanded the case so the habeas court could consider the merits of the claim. *St. Cloud v. Leapley*, 521 N.W.2d 118, 125 (S.D.1994) *(St. Cloud III)*. The habeas court was allowed to "take any necessary additional evidence and enter specific findings of fact and conclusions of law." *Id.*

[¶ 6] On remand, neither the State nor St. Cloud presented additional evidence to the habeas court. The habeas court sent a letter to all persons on the jury panel for St. Cloud's trial, which asked the recipients to identify whether they were full-blood Indian, part-blood Indian or non-Indian.[2]

---

1. The trial court cited SDCL 37–7–4, which defines "Indian" as "any person who is enrolled or who is a lineal descendant of one enrolled upon the enrollment listing of a recognized Indian tribe domiciled within the United States." The parties use the terms "Indian" and "Native

American" interchangeably and for purposes of this opinion, so do we.

2. The habeas court's letter which was printed on circuit court stationery stated:

Dear Jury Panel Member:

■ [¶ 7] From the 1980 census figures, the habeas court determined that "[t]he percentage of jury-age Indians in Lyman County was 17.553% of the total jury-age population of Lyman County."[3] The habeas court considered the responses to its letter as well as evidence admitted at the first habeas hearing and determined that 11% of the 1989 Lyman County jury panel members were Indian.[4] The habeas court therefore determined that Indians were underrepresented by 6.5% (17.5% less 11%).[5] The habeas court determined that St. Cloud's right to a fair cross section of the community was not violated. St. Cloud appeals.

[¶ 8] **1. Whether St. Cloud's constitutional right to a jury representing a fair cross section of the community was violated by the jury panel?**

■ [¶ 9] The Sixth Amendment to the United States Constitution guarantees that a petit jury will be selected from a panel of names representing a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690, 697 (1975); *State v. Hall*, 272 N.W.2d 308, 310 (S.D.1978). SDCL 16–13–10.1 provides in part:

It is the policy of the State of South Dakota that all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community in the municipality,

The Supreme Court has directed me to determine how many members of the jury panel were Indians to determine whether a defendant in a case tried in the year you were on the panel had a fair trial. (1989 panel).

If you wish to mark and return this letter (in the enclosed, stamped, return-addressed envelope), you will not need to appear in court.

_____ I am a full-blood Indian (any tribe)
_____ I am a part-blood Indian (any tribe)
_____ I am not an Indian

Thank you for your assistance. _____

Your Name
Sincerely,
/s/ Max A. Gors

**3.** The habeas court found the number of jury-age Indians was 439. The total jury-age population in Lyman County was 2501. The percentage of jury-age Indians was 17.553%.

district or county where the court convenes. . . .

■ [¶ 10] The defendant has the burden of making a prima facie showing that the cross-section requirement has been violated. *State v. Lohnes*, 432 N.W.2d 77, 83 (S.D.1988) (citing *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690).

To establish a prima facie challenge, the defendant must show that:

(1) the group excluded is a "distinct" group in the community;

(2) the representation of this group in the jury pools is not fair and reasonable in relation to the number of such persons in the community;

(3) this underrepresentation is due to the systematic exclusion of the group from the jury-selection process.

*Lohnes*, 432 N.W.2d at 83–84 (citing *Duren*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579; *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970)).

[¶ 11] St. Cloud alleges and the State does not dispute that Native Americans are a "distinct" group in the community. *United States v. Black Bear*, 878 F.2d 213, 214 (8th Cir.1989). This satisfies the first *Duren* factor.

**4.** The habeas court found the "jury panel contained 22 Indians and 178 non-Indians and the percentage of Indians on the panel was 11% (22/200)." At the habeas trial, St. Cloud called Joyce Estes, an administrative manager for the Bureau of Indian Affairs at Lower Brule who is in charge of enrollment records. Estes identified 18 of the jury panel members as Indian. Responses to the trial court's letter indicated an additional four individuals were Indian.

**5.** "Under the absolute disparity calculation, the percentage of Indians on the list of persons eligible for petit jury service is subtracted from the percentage of Indians in the general population, resulting in a figure constituting the absolute difference." *United States v. Clifford*, 640 F.2d 150, 155 (8th Cir.1981). This is the method utilized by the habeas court in determining the 6.5% underrepresentation.

[¶ 12] St. Cloud claims the habeas court erred in four ways when it applied the second *Duren* factor.[6]

 [¶ 13] First, St. Cloud disputes the habeas court's decision that a jury panel is comprised of a fair cross section of the community if an identifiable group is not underrepresented by more than 15%. *Hall*, 272 N.W.2d at 311 n1, *cited in St. Cloud III*, 521 N.W.2d at 125. St. Cloud claims the Eighth Circuit indicated that an absolute disparity of 10% is the threshold for finding underrepresentation. *United States v. Clifford*, 640 F.2d 150, 155 (8th Cir.1981).[7] In citing *Hall* in *St. Cloud III*, we noted " '[t]rial judges may avoid these challenges by supplementing any jury panel where an identifiable group is underrepresented by fifteen percent or more.' " *St. Cloud III*, 521 N.W.2d at 125 (quoting *Hall*, 272 N.W.2d at 311 n1).

 [¶ 14] Second, the habeas court sent letters to the members of the 1989 jury panel. Four members of the panel responded that they were Indian or part-blood Indian.[8] The responses were admitted as evidence. We review a trial court's decision to admit evidence under the abuse of discretion standard. *State v. White*, 538 N.W.2d 237, 242 (S.D.1995). St. Cloud objects to the letters as inadmissible hearsay. The State claims the responses were admissible as part of a survey or under South Dakota rules of evidence.[9]

[¶ 15] The statements are offered as evidence of a material fact, SDCL 19–16–28(1), that the declarant was or was not Native American. The statements are "more probative on the point for which [they are] offered than any other evidence which the proponent can procure through reasonable efforts." While the habeas court could have called each juror to testify at the habeas hearing, such activity seems excessive when it was possible to contact jurors by mail.[10] The "interests of justice will be served by the admission of the statement into evidence." SDCL 19–16–28(3). The interests of justice in this case demand that information regarding the number of Native Americans in the jury venire be placed before the habeas court. Finally, the statements have "equivalent circumstantial guarantees of trustworthi-

---

6. At the original habeas hearing, St. Cloud presented evidence of the makeup of juries and the Indian population in Lyman County. The State did not present evidence to the contrary at the original hearing or on remand.

7. St. Cloud also presented calculations of "comparative disparity," which "measures underrepresentation by the percentage by which the probability of serving as a juror is reduced for people in a particular category or cognizable class." *Clifford*, 640 F.2d at 155. The comparative disparity calculation is as follows:

> [(Proportion of the population that is in the specified category—Proportion of the source that is in the specified category) divided by Proportion of the population that is in the specified category] × 100.

*Id.* at n. 3. The Eighth Circuit has not adopted the comparative disparity method. *Id.;* Floyd v. Garrison, 996 F.2d 947, 950 (8th Cir.1993). This court has used the absolute disparity method. *See Hall*, 272 N.W.2d at 311.

8. The habeas court noted:

> Fourteen members of the panel were deceased. Addresses were not available for nineteen members. Four responded that they were Indians. Ten did not respond at all. The remainder responded that they were not Indians or gave some other response.

9. SDCL 19–16–28 provides:

A statement not specifically covered by any of §§ 19–16–5 to 19–16–27, inclusive, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by § 19–16–4, even though the declarant is available as a witness, if the court determines that

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of chapters 19–9 to 19–18, inclusive, and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this section unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

10. The habeas court did a cost analysis when it considered the possibility of summoning each juror to appear for questioning. It also considered that the court could possibly be unable to compel tribal members on the Lower Brule Reservation to attend such questioning, and that some jurors might be unwilling to disclose their race during such questioning.

ness" with, for example, "[s]tatements of fact concerning personal or family history" admissible under SDCL 19–16–17. Presumably, each juror signed the statement, and it would have been possible to contact each juror personally to verify the accuracy of the information.

■ [¶ 16] St. Cloud claims the habeas court did not properly enter findings of fact and conclusions of law about the reliability of the statements. *See Matter of R.S.S.*, 474 N.W.2d 743, 750 (S.D.1991). This court in *R.S.S.* cited *State v. Luna*, 378 N.W.2d 229 (S.D.1985), for the proposition that the trial court should make a preliminary determination concerning the reliability of hearsay evidence. *Luna* discussed the defendant's right to confront witnesses against him and stated:

"'The focus of the court's concern is then to insure that there are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant, ... and to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement.'"

*Luna*, 378 N.W.2d at 238 (quoting *State v. McCafferty*, 356 N.W.2d 159, 163 (S.D.1984) (quoting *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 607–08 (1980))). There is no such concern here. The statements, while possibly harmful to the result of St. Cloud's appeal, are not directly adverse to him in a way that necessitates confrontation of the declarant. No person is testifying against St. Cloud.

■ [¶ 17] Third, St. Cloud claims the habeas court erred in limiting the "community" to persons eligible for jury duty.[11] The habeas court used the 1980 census to determine that 23.369% of the total population of Lyman County was Native American. At the time of St. Cloud's trial only registered voters were eligible for jury duty, so the habeas court used the census figures to determine that 17.553% of the jury-eligible (over eighteen years of age) population in Lyman

County was Native American. St. Cloud claims failure to use the total Native American population "skewed the results."

[¶ 18] St. Cloud cites two sources for his position that the total Native American population should be used. First, the United States Supreme Court stated in *Duren*, 439 U.S. at 365 n.23, 99 S.Ct. at 669 n.23, 58 L.Ed.2d at 587 n.23, that the fair cross-section requirement "involves a comparison of the makeup of jury venires or other sources from which jurors are drawn with the makeup of the *community*, not of voter registration lists." However, the petitioner in *Duren* utilized census figures, which included only persons twenty-one years of age and older. *Id.* Second, the Eighth Circuit in *Black Bear*, 878 F.2d at 215, stated: "To determine if Indians are unfairly excluded from juries, we compare [the percentage of Indians in the total population of the counties] to the percentage of Indians on the master jury list."

[¶ 19] The State cites *Davis v. Warden, Joliet Correctional Institution at Stateville*, 867 F.2d 1003, 1014 (7th Cir.1989), where the Seventh Circuit stated:

The census figures arguably are over-inclusive because they include children and other persons ineligible for jury service. *The majority of jury discrimination cases that we found compare the adult voting population with the jury lists drawn ...* The overinclusiveness of defendant's statistic calls into question the weight a court should give to this evidence of unfair and unreasonable representation on the venire.

(Citations omitted) (emphasis added). However, the Seventh Circuit continued:

This is not to say, however, that defendant has failed to prove that blacks were underrepresented on the venire. The Supreme Court, using raw census statistics that included the underaged and unqualified, held that a 23% disparity in the general population and the number of blacks on a grand jury showed unconstitutional discrimina-

---

11. SDCL 16–13–10 provides in part:
 All citizens of this state, who are residents of the county where the jury is selected, eighteen years of age or older prior to January first of the year of jury service, of sound mind and who are able to read, write, and understand the English language, are eligible to serve as jurors....

tion against blacks [in *Turner*, 396 U.S. at 360, 90 S.Ct. at 540, 24 L.Ed.2d at 579].

*Id.* at 1014 (citations omitted). However, St. Cloud's argument fails on this point because the habeas court also considered the under-representation based on the total population of Lyman County. According to the 1980 census, the total population was 3864, of which 903 were Native American. The habeas court found the percentage of Native Americans was 23.5%. The habeas court then subtracted 11%, to reach an absolute disparity of 12.5%, which is less than the 15% underrepresentation at which the jury panel should be supplemented.

■ [¶ 20] Fourth, St. Cloud claims the habeas court erred by using data from the 1980 census, rather than the 1990 census which was taken a few months after St. Cloud's trial. He claims the older data "significantly distorted" the characteristics of the population because 28.9% of the total population of Lyman County was Native American in the 1990 census, while only 23.36% of the total population was Native American in the 1980 census. The habeas court determined the 1980 census figures were more appropriate because "the 1990 census was not taken and therefore not available to the trial court when the jury was selected in this case in December of 1989 when St. Cloud's trial was held." We agree that the determination of underrepresentation should rest on information available to the trial court at the time the jury was selected when, as here, the jury panel was not challenged until after the trial. The habeas court did not err in using data from the 1980 census.

[¶ 21] Therefore, St. Cloud has failed to meet the second *Duren* factor in that he failed to show the representation of this group in the jury pools was unfair or unreasonable in relation to the number of such persons in the community.

[¶ 22] Although it is not necessary to reach the third *Duren* factor in this case, we do so for the benefit of the bench and the bar.

[¶ 23] In *State v. Rough Surface*, 440 N.W.2d 746 (S.D.1989), while acknowledging *Hall's* 15% rule, we upheld the method of selection of the jury panel as racially neutral. We cited with approval the observation of the Eighth Circuit in *Clifford*, 640 F.2d at 156, that:

> "[T]here has been no showing that juries are not selected from a fair cross section of the community or that there has been exclusion of jurors based on any basis other than failure to register to vote.... The mere fact that one identifiable group of individuals votes in a lower proportion than the rest of the population does not make the jury selection system illegal or unconstitutional."

*Rough Surface*, 440 N.W.2d at 749 (quoting *Clifford*, 640 F.2d at 156). It has been suggested that Native Americans may opt for registering and voting in tribal elections rather than registering to vote in state elections from which the voter lists have been traditionally drawn. *Cf. Buckanaga v. Sisseton Indep. School Dist.*, 804 F.2d 469, 476 (8th Cir.1986).

[¶ 24] In *United States v. Garcia*, 991 F.2d 489 (8th Cir.1993), the court held that it is appropriate to address the third part of the *Duren* test, that being whether there was a "systematic exclusion," prior to any analysis of statistical data. The court concluded that, in order to prove systematic exclusion, the defendant must show that the exclusion is "inherent in the particular jury-selection process utilized."[12] *Garcia*, 991 F.2d at 491. The Eighth Circuit held that Garcia failed to show that the voter registration qualifications, which were the source of the jury pool, and the administration of the selection of the jury pool, was "administered in a discriminatory manner." *Id.*

[¶ 25] *Garcia* was followed in *United States v. Warren*, 16 F.3d 247 (8th Cir.1994). The court held that despite the defendant's statistical data which supposedly showed underrepresentation of African–Americans in the venire pool, he failed to offer evidence of

12. The court specifically affirmed its holding of *Clifford* to the effect that South Dakota's federal court system of jury selection by voter registration lists was constitutional. Prior to 1991, South Dakota's state jury-selection system was the same. SDCL 16–13–4.1. It is now comprised of current registered voters and driver's license lists. *Id.*

the "systematic exclusion" of African–Americans in the jury-selection process. The court rejected the argument that "numbers alone are sufficient proof of systematic exclusion." *Warren,* 16 F.3d at 252. The Eighth Circuit considered Minnesota's jury-selection process and stated:

> [Defendant] has failed to offer any other evidence of systematic exclusion. For example, he has failed to point to a defect in the process itself that serves to exclude African–Americans. Nor has [defendant] alleged that the voter registration, driver's license, or state identification requirements impose any discriminatory qualifications on applicants. Nor has [defendant] shown that the administration of the juror selection plan is discriminatory. Consequently, we find no Sixth Amendment violation.

*Warren,* 16 F.3d at 252 (citing *Garcia,* 991 F.2d at 492, which examined Iowa's jury-selection process). The court concluded that Warren failed to show any discriminatory qualifications to become eligible for jury service or that the administration of the juror selection plan was discriminatory.

[¶ 26] There is nothing novel about the *Garcia–Warren* analysis. This Court basically adopted the same approach in *State v. Plenty Horse,* 85 S.D. 401, 184 N.W.2d 654 (1971), a case that was decided on the basis of an equal protection challenge. We held that near total exclusion of Native Americans from the jury lists, together with the attitude of local officials charged with administering the selection process, resulted in a violation of the rule that one cannot intentionally exclude members of a race from jury service on the basis of race or color.

[¶ 27] While statistical data certainly will have some relevance depending on the other facts of the case,[13] it should not be the beginning and the end of the analysis to the exclusion of everything else. It cannot be assumed "that all citizens are fungible for

purposes of determining whether members of a particular class have been lawfully excluded." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706, 726, 102 L.Ed.2d 854, 887 (1989) (citing *Mayor v. Educational Equality League,* 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974)). If statistical evidence of disparity alone was adequate to establish a violation of the cross-section guarantee, the third prong of the *Duren* test would be surplusage. *People v. Bell,* 49 Cal.3d 502, 262 Cal.Rptr. 1, 15, 778 P.2d 129, 143 (1989). Under the *Garcia–Warren* discrimination test, the trial court determines if discrimination exists. Once the source of discrimination has been identified, it can be removed and the panel properly supplemented.

[¶ 28] For all of these reasons, the defendant fails in his burden to show a "systematic exclusion." *Duren,* 439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587.

[¶ 29] **2. Whether St. Cloud was denied effective assistance of counsel.**

[¶ 30] St. Cloud claims he was denied effective assistance of counsel because his trial counsel did not object to the makeup of the jury panel.

> "We have adopted the two-prong test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for ineffective assistance of counsel claims. First, the applicant must prove that his trial counsel's performance was deficient. He must show that trial counsel made errors 'so serious that counsel was not functioning as the "counsel" guaranteed ... by the Sixth Amendment.' Secondly, he must show that the deficient performance 'prejudiced the defense' by showing that 'counsel's errors were so serious as to deprive the defendant of a fair trial.' The reasonableness of trial counsel's action is evaluated from his perspective at the time the alleged error occurred."

---

**13.** In *Plenty Horse,* it was established that in Cedar Butte Township, which was 60% Native American, there had never been a person of that descent certified on its jury lists during the ten years preceding trial. Likewise, Norris Township, which had in excess of 60% Native American population, had only one Native American name qualified for jury duty in the past ten years.

85 S.D. at 405–06, 184 N.W.2d at 656. In *Duren,* women constituted 54% of the adult female population but only 15% of the jury venires were women. The reason for this vast difference was that, at that time, Missouri had a law that allowed women to opt out of jury service but did not allow the same option to men. 439 U.S. at 359, 99 S.Ct. at 666, 58 L.Ed.2d at 583–84.

*Garritsen v. Leapley,* 541 N.W.2d 89, 93 (S.D.1995) (quoting *Mitchell v. Class,* 524 N.W.2d 860, 862 (S.D.1994)).

[¶ 31] St. Cloud does not claim he was prejudiced by trial counsel's actions. The State argues he was aided by trial counsel's strategy. At the habeas hearing, St. Cloud's trial counsel, Steve Rabuck, was called and stated, "[St. Cloud's] reputation up at Lower Brule was quite bad." When asked if he "would have been inclined to leave jurors from Lower Brule on a jury panel" on a case involving St. Cloud, trial counsel answered, "no." Larry Hollman, a former prosecutor for the Lower Brule Sioux Tribe testified, and stated, "[St. Cloud] was not well liked around the community, from the people that I talked to." Hollman and Larry Mammula, the Dakota Plains Legal Services attorney, also testified that it was common knowledge on the reservation that St. Cloud had at one time pled guilty to this crime in federal court.

[¶ 32] Steve Smith, an attorney who had assisted Rabuck in jury selection was asked whether they wanted Indians from Lower Brule on the jury and answered:

> We had some concerns. We knew that [St. Cloud's] general reputation in Lower Brule was not very highly thought upon. And secondly, we were very concerned over the fact that many people in Lower Brule were afraid of, or knew, [St. Cloud] had previously ... pled guilty in federal court to the rape conviction ... We were afraid that we might have someone put on the jury who would have said, "No, I know nothing about this case, I can be fair," but by the same token knew that [St. Cloud] previously had pled guilty.

Smith also testified that if one prospective juror from Lower Brule had divulged St. Cloud's guilty plea to the entire panel, counsel "would have had to move for a mistrial and start over."

[¶ 33] The habeas court determined the jury panel was comprised of a fair cross section of the community and held it was not necessary to answer this question. St. Cloud has not shown ineffective assistance of counsel.

[¶ 34] Affirmed.

[¶ 35] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

